UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| NATIONWIDE PROPERTY & CASUALTY INSURANCE CO., As subrogee of Matthew Storm | § § § § | |
| Plaintiff, | § | |
| VS. | § § | CIVIL ACTION NO. 3:13-CV-83 |
| GENERAL MOTORS, LLC, *et al*, | § § § | |
| Defendant. | | |

## **MEMORANDUM AND ORDER**

A fire occurred in the garage of Matthew Storm's home. The cause is believed to have been a malfunctioning component of his Chevrolet pickup truck. Plaintiff Nationwide Property & Casualty Company paid Storm's losses, and then filed this subrogation action seeking to recover those amounts from Defendants General Motors and AutoNation Chevrolet Gulf Freeway (AutoNation). The liability theory advanced against AutoNation is that when it serviced Storm's truck prior to the fire, it failed to run a computer check that would have detected a recall on the defective component. AutoNation's motion for summary judgment focuses on a single question: does an authorized auto dealership have a duty to check for recalls when a customer brings a vehicle to the dealership for service?

1

## I.   FACTUAL AND PROCEDURAL BACKGROUND[1]

Storm's truck, a 2007 Chevrolet Avalanche, caught fire in June 2012 while parked in his garage. Nationwide, which had issued a homeowner's policy to Storm, conducted an investigation and concluded that the fire was caused by a malfunction of the Avalanche's windshield wiper fluid heater module.[2] The defective module has been the subject of investigation by the National Highway Traffic Safety Administration and of two separate GM recalls.

The first recall was issued in 2008. Defendant Norman Frede Chevrolet worked on the Avalanche in July 2009 and performed the recall work. After new reports surfaced of problems with the module, GM issued a second recall in July 2010. The recall directed dealers and retailers to permanently disable and remove the module, and noted that one of the safety risks posed by the module was the possibility of a fire, even with the vehicle parked and the ignition switched off. It further provided that "whenever a vehicle subject to this recall . . . is in your dealership for service in the future, you must take the steps necessary to be sure the recall correction has been made before . . . releasing the vehicle." *See* Docket Entry No. 70-2 at 31 (GM Recall No. 10153). This command is in line with GM's agreements with dealers like AutoNation, which require the dealers to run a GM

---

[1] The Court's recitation of the facts resolves all reasonable doubts in favor of Johnson as the non-movant. *See Evans v. City of Houston*, 246 F. 3d 344, 348 (5th Cir. 2001) (citation omitted).

[2] Defendants have not designated any experts or produced any expert reports disputing the findings of Nationwide's investigation.

vehicle's vehicle identification number (VIN) to check for open recalls whenever a GM vehicle is brought in for service to the dealership.  *See* Santrock Dep., Docket Entry No. 76-5 at 58–59; *see also* Riley Dep., Docket Entry No. 72-2 at 17–18 (explaining that any time a GM car comes in for service, AutoNation is required to bring up the vehicle's Global Connect, which details any recalls, among other information).  The dealership is then required to either perform recall repairs or to note that the vehicle owner refused to have the repairs done.  *See* Santrock Dep., Docket Entry No. 76-5 at 59–60; *see also* Docket Entry No. 70-2 at 3, 10 (GM Recall No. 10153).  GM compensates dealerships for performing recall work.  *See* Santrock Dep., Docket Entry No. 76-5 at 60; *see also* Docket Entry No. 70-2 at 30 (GM Recall No. 10153) (explaining procedure for dealers to submit reimbursement claims).

On October 1, 2011, Storm had his Avalanche towed to AutoNation, an authorized GM dealership, because of a flat tire.  AutoNation sells new and used cars and offers vehicle maintenance and repair services.  AutoNation opened a repair order, which listed the Avalanche's VIN, and assigned a service advisor to the truck.  The repair order shows that AutoNation put a spare tire on the Avalanche and, at Storm's request, performed a multi-point inspection which included checking the brake lining, the tire tread depth, and the battery.[3]  *See*

---

[3] AutoNation maintains that it performed no service work beyond putting the spare tire on the

Docket Entry No. 70 at 13, 15 (AutoNation repair order). The Avalanche was ready ten days later, on October 11, 2011. AutoNation did not charge Storm for the service, and did not advise Storm of the recall notice. *See id.* at 14, 16.

Nationwide filed suit against GM in state district court, asserting products liability and warranty claims. After GM removed the case to federal court, Nationwide filed an amended complaint asserting that AutoNation was negligent in failing to perform the recall work on the Avalanche. *See* Docket Entry No. 3 at 4–5. AutoNation then filed the pending motion for summary judgment, contending that it owed no duty to Storm to check for open recalls or perform recall repairs.

**II.     ANALYSIS**

A negligence claim under Texas law requires three elements: (1) a legal duty owed by one person to another; (2) a breach of that duty; and (3) damages proximately caused by the breach. *See D. Houston, Inc. v. Love*, 92 S.W.3d 450, 454 (Tex. 2002) (citing *El Chico Corp. v. Poole*, 732 S.W.2d 306, 311 (Tex. 1987)). "Whether a duty exists is a question of law for the court to decide under the facts surrounding the occurrence in question." *Lefmark Mgmt. Co. v.*

---

truck. The repair order, however, states that "customer requested to [*sic*] multi-point inspection performed this visit" and reflects that the brake lining, tire tread depth, and battery were checked. *See* Docket Entry No. 70 at 15 (AutoNation repair order). In light of the summary judgment posture, the Court must resolve all reasonable doubts in favor of Nationwide as the nonmovant. *See Evans*, 246 F.3d at 348 (citation omitted). Moreover, Nationwide relies on testimony from GM and AutoNation that the VIN check requirement applies even when a vehicle is brought in to have a flat tire repaired. *See* Santrock Dep., Docket Entry No. 76-5 at 59–60; *see also* Riley Dep., Docket Entry No. 72-2 at 20–21.

*Old*, 946 S.W.2d 52, 53 (Tex. 1997) (citing *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995)). The decision to impose a legal duty "is a multifaceted issue requiring [courts] to balance a number of factors," including risk and utility. *Tex. Home Mgmt., Inc. v. Peavy*, 89 S.W.3d 30, 33 (Tex. 2002) (citations omitted). This inquiry balances "the risk, foreseeability, and likelihood of injury against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing that burden on the defendant." *See Nabors Drilling, U.S.A., Inc. v. Escoto*, 288 S.W.3d 401, 410 (Tex. 2009) (citations omitted). Courts also consider "whether one party would generally have superior knowledge of the risk or a right to control the actor who caused the harm." *Humble Sand & Gravel, Inc. v. Gomez*, 146 S.W.3d 170, 182 (Tex. 2004) (quoting *Praesel v. Johnson,* 967 S.W.2d 391, 397–98 (Tex. 1998)).

AutoNation contends that it did not owe a duty to Storm because it did not sell the truck and performed only a minor repair on it (replacing the flat tire) free of charge. To support its position, AutoNation relies on *New Tex. Auto Auction Servs., L.P. v. Gomez De Hernandez*, 249 S.W.3d 400 (Tex. 2008). In *Gomez*, the defendant was an auction house that sold a sport utility vehicle to a business, which in turn sold the SUV to a car dealership; the motorist who eventually purchased the SUV from the dealership was killed in a rollover accident resulting from tire

failure. 249 S.W.3d at 402. The plaintiffs alleged that the auctioneer was negligent in failing to replace the SUV's tires pursuant to a manufacturer recall that had been issued a few weeks before the auctioneer sold the SUV. *Id*. at 406. The *Gomez* court applied the risk-utility test and concluded that automobile auctioneers do not have a common law duty to "discover and remedy unknown dangers." 249 S.W.3d at 407.

AutoNation interprets *Gomez* to stand for the proposition that a dealer does not owe a duty to notify a customer about recalls and to perform the recall repairs. *Gomez*, however, was about an auctioneer's duty to discover "unknown dangers." That is not the case here because AutoNation's status as a GM dealer gave it easily accessible knowledge about the Avalanche recall via the electronic VIN check. That drastically changes the risk-utility calculus and compels a different result.

Indeed, much of the *Gomez* reasoning supports the existence of a legal duty in this authorized dealership situation—a scenario far different from one involving an auto auctioneer that has no relationship with a particular manufacturer and no specialized knowledge of particular vehicles. On the risk side of the equation, *Gomez* noted that "[u]nquestionably, ignoring a recall may run the risk of severe injury." But most of the concerns it noted on the other side of the equation do not apply to an authorized dealer servicing a vehicle after the recall. *Gomez* noted that a heavy burden would flow from "imposing a duty on auto auctioneers to discover

and repair defects" because doing so "would require them to go into a side business other than their own." *Id.* at 406. That is not the case for AutoNation, which needed to incur only the negligible burden of entering the VIN into its computer system to find the recall and the instructions for repairing the problem. *See* Riley Dep., Docket Entry No. 72-2 at 39 (noting that complying with the obligation to search for open recalls only takes a dealership's service department "a few minutes"). And, of course, "inspecting and repairing" vehicles already constitutes the service side of AutoNation's business.

The availability of a VIN check not only makes the burden of a duty on AutoNation much lighter than it would be for an auto auctioneer, but it also affects the factor concerning superior knowledge. AutoNation has specialized knowledge of the Avalanche recall as a GM dealer, whereas an auto auctioneer has no ties to any particular type of vehicle. *See Gomez*, 249 S.W.3d at 406. (noting that "whatever access to recall information [the auctioneer] may have, the dealers who buy at the auction, prepare the cars for display, and sell them to the public would have at least the same access"). It is not just the VIN check that provides this knowledge. GM dealerships are sent recall bulletins, can access those bulletins through GM's electronic service information site, and can access applicable open and closed recalls for each vehicle through GM's global warranty site. *See* Santrock Dep., Docket Entry No. 76-5 at 92. This library of notices and network

7

of electronic systems creates a vastly different relationship between manufacturer and defendant than was the case in *Gomez*, in which the defendant was an auctioneer not connected with the manufacturer in any way.

The only risk-utility factor that counsels against a finding of duty here is the consideration of "the right to control the actor who caused the harm." A dealer does not have control over GM's manufacturing process, although it still has more influence than an auto auctioneer as it services numerous GM vehicles and can alert GM to defects that it observes in those vehicles.

The overall assessment of the risk-utility factors thus strongly supports the existence of a duty in this case. GM's electronic systems allowing AutoNation to easily search for open recalls makes the burden of checking for recalls insignificant, and the consequences of doing so—preforming the recall work—are minor given that AutoNation is already in the auto repair business and is compensated by GM for the repairs. Against these slight inconveniences to the dealer is the significant benefit of preventing a highly foreseeable and serious harm as the fire that occurred in this case demonstrates (and that would have been even more serious if a person had been harmed in the fire). *Gomez* was concerned about imposing a "sweeping" recall duty that would extend to all sellers of used cars for any type of vehicle. 249 S.W.3d at 407. A duty on an authorized dealer to run a computerized check of recall notices on a vehicle it services—which is already

required by the dealer's internal policies—is far narrower. The balance of the common law factors therefore strongly supports imposing this duty.[4] *Cf. Casa Ford, Inc. v. Ford Motor Co.*, 951 S.W.2d 865, 872 (Tex. App.—Texarkana 1997, pet. denied) (noting in dicta, when trial court found dealer negligent for failure to perform recall, that dealer's duty to perform recall "arose from its knowledge of the recall" and that "[e]very used car dealer with knowledge of the recall would have the same duty").

One final point: Determining whether to impose a duty on an authorized dealer that services a vehicle after a recall has issued is a much different inquiry than whether to impose a duty on a dealer to send recall notices to customers to whom it sold vehicles before a recall issued. *See, e.g.*, *Murray v. Gen. Motors, L.L.C.*, 478 F. App'x 175, 182 (5th Cir. 2012) (holding that under Mississippi law a car dealership does not have a post-sale duty to notify a buyer about manufacturer recalls); *cf. Silver v. Bad Boy Enters. L.L.C.*, 907 F. Supp. 2d 1351, 1356–57 (M.D. Ga. 2012) (noting that under Georgia law manufacturers have no duty to recall after products have left their control but still finding fact issue existed concerning whether defendant assumed a duty to conduct a recall campaign and negligently conducted that campaign). The much broader duty rejected in

---

[4] Given this holding that a common law duty exists in these circumstances, the Court need not reach the alternative theory advanced by Nationwide that AutoNation had a contractual duty arising from the dealer service agreement.

those cases would have imposed far greater costs on dealers with little additional benefit than what a manufacturer recall notice would have already provided to vehicle owners.

* * *

For the reasons explained above, Defendant AutoNation's Motion for Summary Judgment (Docket Entry No. 64) is **DENIED**.

**SIGNED** this 20th day of March, 2015.

_____
Gregg Costa
United States Circuit Judge[*]

---

[*] Sitting by designation.